UNITED STATES of America

v.

Gary Barrett GREEN, Appellant.

No. 81–1391.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1981.

Decided Dec. 24, 1981.

Ed Wilhite, Washington, D. C. (appointed by this Court), for appellant.

Marc B. Tucker, Asst. U. S. Atty., Washington, D.C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, John R. Fisher and Robert B. Cornell, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before TAMM, WILKEY and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case Gary Barrett Green appeals his conviction for possession of a controlled substance (heroin) with intent to distribute, a violation of 21 U.S.C. § 841(a) (1976). After the District Court denied Green's motion to suppress evidence, *United States v. Green*, Crim. No. 81–10 (D.D.C. March 12, 1981) (memorandum order explaining previous ruling from the bench denying motion to suppress), Green waived trial by jury and was found guilty on a stipulation of the evidence, *United States v. Green*, Crim. No. 81–10 (D.D.C. March 10, 1981).

On appeal Green challenges the outcome of the suppression hearing on two grounds: first, that the police lacked probable cause for arrest and, therefore, could not properly seize a paper bag found to contain heroin; and second, that the District Court erred when it sustained the Government's objection to the disclosure of the Police Department's surveillance location.

For the reasons set forth below, we find that there was probable cause to arrest Green and, therefore, that the paper bag was validly seized incident to a lawful arrest. We also conclude that the Government has a qualified privilege during a suppression hearing not to disclose its surveillance locations and that the District Court's recognition of that privilege in this case was not error. Accordingly, we affirm the denial of the motion to suppress and Green's resulting conviction.

## I. BACKGROUND

During the morning of December 6, 1980, Officer Timothy Allman, an experienced member of the Third District Drug Enforcement Unit of the District of Columbia, was stationed in an undisclosed observation post investigating narcotics activity at the intersection of 14th and V Streets, N.W. The District Court found that this neighborhood is notorious for the trafficking of heroin and other narcotics. At about 11:25 a. m., Officer Allman observed with the aid of binoculars a man later identified as appellant Green, a woman later identified as Carol Turner, and an unidentified man on the southwest corner of the intersection. Officer Allman saw the unidentified man approach Ms. Turner, converse briefly with her, and then hand her some paper currency. Turner then walked several feet to Green and handed him the money. Green took the money, stuffed it in his left trouser pocket, reached into a paper bag in his left jacket pocket, and appeared to hand a small object from the bag to Turner. Officer Allman was unable to see the exchanged object which was concealed in Green's cupped hand and then in Turner's. Turner returned to the unidentified man and handed him the object. After receiving it from Turner, the unidentified man left the area. Officer Allman then saw Green push the top of the brown paper bag back into his left jacket pocket, concealing it from view.

Believing that he had just observed a typical "two-party drug transaction,"[1] Offi-

---

1. The term "two-party drug transaction" refers to a narcotics sale in which two individuals sell

cer Allman radioed descriptions of Green and Turner to officers awaiting his instructions in an unmarked patrol car two blocks north of the 14th and V intersection. The officers drove to the intersection, and Officer David Willis spotted Green from Allman's description. Green apparently recognized either the unmarked police car[2] or the officers as they approached. He walked quickly into Willie's Carryout at 2030 14th Street, looking back over his shoulder at Officer Willis who had left the patrol car to pursue Green on foot. Officer Willis saw Green open the carryout door with his left hand, move five or six feet inside the carryout, motion with his right hand, and then start to move back out the door. As Green exited the carryout, Officer Willis arrested him. Officer Willis found a brown paper bag lying on the unoccupied counter inside the carryout, only three to five feet away from Green's position at the time of the arrest. The paper bag was within Green's reach and could have been placed on the counter by the movement of Green's right hand that Officer Willis had observed just before Green started out of the carryout. The bag contained fourteen small packets of heroin. A search of Green resulted in the seizure of $242.00.

## II. PROBABLE CAUSE

The District Court found that the totality of facts and circumstances presented in this case was sufficient to establish probable cause for Officer Willis' arrest of the appellant.[3] In particular, the trial court relied on the combination of three factors to support its conclusion: (1) the sequence of events between Green, Turner and the unidentified man, which was typical of a two-party narcotics transaction; (2) the movements of the three persons' cupped hands and Green's subsequent stuffing of the protruding paper bag back into his coat pocket, suggesting an attempt to conceal the object of their transaction; and (3) the appearance of flight and evasion by Green when pursued by Officer Willis. We agree that these three factors, especially when observed by experienced police officers in an area noted for the regularity of narcotics trafficking, provided probable cause for the arrest.

■ In reaching this conclusion we recognize that no one of these factors alone would be adequate to establish probable cause. First, a sequence of events which is typical of a common form of narcotics transaction may create a suspicion in a police officer's mind, but probable cause, of course, requires more than mere suspicion. *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). This court has never held that the observance of a suspicious transaction, without more, provides probable cause for arrest. *See United States v. Davis*, 561 F.2d 1014, 1017 (D.C.Cir.), *cert. denied*, 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977); *Von Sleichter v. United States*, 472 F.2d 1244, 1246, 1248 (D.C.Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 555, 34 L.Ed.2d 517 (1972).[4]

the narcotics. As described to the District Court, one individual holds the drugs. A second individual—known as a "runner"—receives the money from a customer, carries it to the individual holding the drugs, and returns the purchased drugs to the customer. This form of transaction provides the narcotics dealer some measure of protection from robbery. Tr. 45–46. (All "Tr." citations refer to the transcript of the suppression hearing held on February 20, 1981.)

2. Officer Allman testified that "[a]n unmarked police vehicle ... probably stands out just as much as a marked car in that particular area." Tr. 20.

3. The District Court also found that Green "had not abandoned the bag in a public place sufficiently to lose an expectation of privacy" and, therefore, had standing to challenge the seizure of the paper bag incidental to his arrest. *United States v. Green*, Crim. No. 81–10, Memorandum Order at 3 (D.D.C. March 12, 1981). The Government has not challenged this finding on appeal.

4. In each of the cases in which this Circuit has found probable cause for a narcotics arrest based in part upon a suspicious transaction, there has also been other evidence suggesting that the transaction was drug-related. *See, e.g., United States v. White*, 655 F.2d 1302, 1303 (D.C.Cir.1981) (per curiam) (automobile

■ Second, the sole fact that individuals may seek to conceal the subject of their business from potentially prying eyes, even on a public sidewalk, does not grant the police the power to arrest them. While it is true that persons engaged in illegal transactions will desire to conceal those transactions, the desire for privacy in one's affairs is common among law-abiding persons as well. Thus, the police cannot conclude that merely because an object or a transaction is not openly displayed, it is necessarily illegal.

■ Third, this court has held that flight is not a "reliable indicator of guilt without other circumstances to make its import less ambiguous." *Hinton v. United States*, 424 F.2d 876, 879 (D.C.Cir.1969) (footnote omitted). Of course, " 'when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime,' [flight or evasion] may properly be considered in assessing probable cause," *Hinton v. United States*, 424 F.2d at 879 (footnote omitted) (quoting *Sibron v. New York*, 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968)), but flight alone is insufficient to give the police probable cause to arrest.

■ Fourth, the presence of a person in a neighborhood notorious for the frequency of narcotic sales or other crimes does not create probable cause to arrest that person.

Although our decisions have stated that geographic area is a valid consideration in the probable cause calculus, *e.g., United States v. Davis*, 458 F.2d 819, 822 (D.C.Cir.1972) (per curiam), this fact without more does not even establish grounds for an investigatory stop, *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (unanimous Court), let alone probable cause for an arrest.

■ Although none of these four factors is adequate by itself to establish probable cause, it is their combination in the particular circumstances confronting Officers Allman and Willis that is the proper subject of consideration. Probable cause is not determined by observing some single factor which this court has deemed relevant, or even by observing any certain number of them.[5] Rather, probable cause exists if the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his training and experience, would lead that police officer to believe that a criminal offense has been or is being committed. *See, e.g., Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Davis*, 458 F.2d 819, 821 (D.C.Cir.1972) (per curiam).

■ In this case the basis for that reasonable belief of criminal activity existed. When Officer Allman observed the appel-

frequently visited by known drug addicts); *United States v. Davis*, 561 F.2d 1014, 1016–17 (D.C.Cir.), *cert. denied*, 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977) (repeated transactions and officer's observation of pink tablets); *United States v. Thomas*, 551 F.2d 347, 347–48 (D.C.Cir.1976) (per curiam) (silver object identified as tinfoil packet); *United States v. Brown*, 463 F.2d 949, 950–51 (D.C.Cir.1972) (per curiam) (highly unusual conduct and "glassy" eyes suggesting that appellant was using narcotics); *United States v. Davis*, 458 F.2d 819, 820, 822 (D.C.Cir.1972) (per curiam) (appellant in the company of individuals under the influence of narcotics); *Washington v. United States*, 397 F.2d 705, 706 (D.C.Cir.1968) (known addict spilled capsules on the street).

5. For example, in *United States v. Tookes*, 633 F.2d 712 (5th Cir. 1980), the Fifth Circuit held that the police lacked probable cause for arrest when a convicted felon fled from two plainclothes police officers who ordered him to stop when they spotted him in an area noted for

narcotics trafficking. Despite the defendant's flight and his presence in a high-crime area, the Fifth Circuit noted the absence of any other indicia of criminal activity.

In *United States v. Jenkins*, 530 F.Supp. 8 (D.D.C.1981), the court held that the observance of a suspicious transaction in a high narcotics area did not provide probable cause for arrest. The court distinguished previous cases in this Circuit that found probable cause, *see* note 3 *supra*, from the facts presented in *Jenkins* because each of the previous cases also included the identification of a type of package known to be used in narcotics trafficking, the observation of known drug addicts or drug-related behavior, or the defendant's attempt to flee from the arresting officer. Lacking any of those additional indicia of criminal activity, the District Court concluded that a suspicious transaction in a certain geographic area was insufficient to establish probable cause.

lant Green, Carol Turner, and the unidentified man engage in a pecuniary transaction of a type common to narcotics peddling, his suspicion was aroused. This was only natural given that Officer Allman is an experienced drug enforcement officer and that illegal drug activity is known to be common in that area. Watching the transaction closely, Officer Allman noticed that the parties to the transaction attempted to conceal the exchanged object. Then, when the appellant noticed Officer Willis approaching, he turned and walked rapidly into Willie's Carryout. Once inside, the appellant made a motion as if to dispose of an object he was carrying. *Cf. United States v. Johnson,* 459 F.2d 1229 (D.C.Cir.1972) (per curiam) (underhanded throwing motion after spotting narcotics agent).

Given this set of events, and the order in which they occurred, Officers Allman and Willis concluded that the appellant had engaged in criminal activity. No plausible, innocent explanations for this sequence of behavior readily spring to mind, nor has the defendant suggested any, either in this court or in the court below. *See United States v. Thomas,* 551 F.2d 347, 348 (D.C. Cir.1976) (per curiam). Thus, we conclude that when Green was arrested, there was sufficient basis for Officers Willis and All-

man reasonably to believe that the appellant had engaged in criminal activity.[6]

## III. CROSS–EXAMINATION OF OFFICER ALLMAN

### 1. *The Issue in This Case*

During the Government's presentation of evidence at the suppression hearing, Officer Allman testified that he was in a "hidden observation post" near 14th and V Streets, N.W. on December 6, 1980. He further testified that he was making observation with a pair of $10 \times 50$ power binoculars and that the weather that morning was sunny and clear. Tr. 4–5. On cross-examination defense counsel attempted to ascertain the location of Officer Allman's hidden observation post. After learning that Officer Allman was 75 to 80 feet from the observed transaction and was about 40 feet above ground level, the Government objected to a question that might have identified the building in which Allman was located. That objection was sustained.[7] Green contends in this appeal that the trial court erred in allowing Officer Allman to refuse to disclose his surveillance location at the suppression hearing.

---

**6.** At oral argument defense counsel conceded that probable cause is measured by an objective test of the facts known to the arresting officers at the time of the arrest. *See Scott v. United States,* 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978); *United States v. Bugarin-Casas,* 484 F.2d 853, 854 & n.1 (9th Cir. 1973), *cert. denied,* 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974); 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.2(b) (1978). Thus, the fact that Officer Allman instructed Officer Willis to arrest appellant Green *before* Green fled Officer Willis has no bearing on the outcome of the case, and Green's flight may properly be considered in determining the existence of probable cause.

**7.** The following colloquy took place during defense counsel's cross-examination of Officer Allman:

Q. Where was it that you were making these observations from? What location?

A. It was approximately 75 to 80 feet from where the two were standing.

Q. Were you on ground level?

A. No, sir.

Q. Okay, three stories up, three, four stories up?

A. I was maybe 40 feet from the ground.

Q. And you were generally in a westerly—making these observations from the west—I am sorry, from the east? To be more specific, you were making these observations, were you not, from the Metro building across the street?

MR. CORNELL [Government Attorney]: Objection, Your Honor.

THE COURT: What is the objection?

MR. CORNELL: We don't think that it is—in this kind of proceeding that the police should be required to disclose—

THE COURT: That is sustained. Objection sustained.

Tr. 18. Defense counsel later expressed his disagreement with this limitation on his cross-examination, Tr. 23–24, to which the Court commented: "I believe they [the police] are entitled to protection of their tactics and techniques in this kind of a situation." Tr. 24.

## 2. The General Right of Cross-Examination

■ It is clear that a defendant has some right to cross-examine Government witnesses at a suppression hearing. "For two centuries judges and lawyers have regarded the opportunity of cross-examination as an essential safeguard of the accuracy and completeness of testimony. Thus cross-examination is not a mere privilege but is the right of the party against whom a witness is offered." 2 C. Wright, Federal Practice and Procedure: Criminal § 416, at 179–80 (1969) (footnotes omitted). The adversary procedure of suppression hearings is well established in the federal courts, and there is no suggestion before us that a District Court could totally eliminate a defendant's right of cross-examination at this stage of the criminal proceedings. *See Jackson v. United States*, 336 F.2d 579, 580 (D.C.Cir. 1964) (per curiam). Indeed, the suppression hearing is a critical stage of the prosecution which affects substantial rights of an accused person; the outcome of the hearing— the suppression *vel non* of evidence—may often determine the eventual outcome of conviction or acquittal. *E.g., Olney v. United States*, 433 F.2d 161, 163 (9th Cir. 1970); *cf. Wade v. United States*, 388 U.S. 218, 224, 87 S.Ct. 1926, 1930–1931, 18 L.Ed.2d 1149 (1967) (right to counsel at "pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality"). Thus, whether we describe the right of cross-examination as deriving from the fundamental concepts embedded in the Due Process Clause or as implicit in the rules governing federal criminal proceedings, *e.g.*, Fed.R.Crim.P. 12, 26, 41; Fed.R.Evid. 611, we have no doubt of the applicability of the right here or of its importance. *See, e.g., Greene v. McElroy*, 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413– 1414, 3 L.Ed.2d 1377 (1959); 5 J. Wigmore, Evidence § 1367 (J. Chadbourn rev. ed. 1974).[8]

■ Because of the historical and practical importance of the right of cross-examination, any limitations on this right (beyond the typical evidentiary rules limiting its scope to the subject matter of direct examination and to matters affecting witness credibility, Fed.R.Evid. 611 (b)) must be justified by weighty considerations. *See Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045–1046, 35 L.Ed.2d 297 (1973).

## 3. The "Informer's Privilege"

■ One limitation on a defendant's right to cross-examine Government witnesses is the "informer's privilege," which allows the Government to refuse to disclose the identity of a person who has furnished information about criminal activities. In *McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), the Supreme Court upheld this testimonial privilege in the context of a pretrial suppression hearing. Two police officers had made a warrantless arrest of McCray based on information provided them by a reliable informer. At the hearing on the motion to suppress the narcotics seized in a search incidental to the arrest, McCray sought to learn the informer's identity. The prosecuting attorney objected to this cross-examination of the arresting officers, and the trial court sustained the objection. The Supreme Court held that the trial court did not violate the Constitution in sustaining the objections and protecting the identity of the informer.[9]

---

**8.** *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), is not to the contrary. In *Gerstein* the Supreme Court held that a probable cause determination for the sole purpose of pretrial detention must be made by a judicial officer, but that this determination does not require "the full panoply of adversary safeguards—counsel, confrontation, cross-examination, and compulsory process for witnesses." 420 U.S. at 119, 95 S.Ct. at 865–866. The holding in *Gerstein*, however, is limited to pre- trial proceedings which cannot impair the accused's defense on the merits. *See* 420 U.S. at 122–23, 95 S.Ct. at 8671–868.

**9.** The Supreme Court in *McCray* explicitly distinguished its treatment of the informer's privilege in the suppression hearing context from its earlier ruling in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In *Roviaro* the Court held that at trial the informer's privilege is limited by "the fundamental

Long recognized at common law, the informer's privilege serves important individual and societal interests in protecting the anonymity of citizens who cooperate in law enforcement. *See generally* 8 J. Wigmore, Evidence § 2374 (J. McNaughton rev. ed. 1961); 2 D. Louisell & C. Mueller, Federal Evidence §§ 235–237 (1978). The privilege protects the informer and his family from possible physical harm or from other potential undesirable consequences. Moreover, the availability of the privilege preserves the usefulness of those who have aided the police in law enforcement and may encourage other citizens to supply information concerning the commission of crimes. *See, e.g., United States v. Tucker*, 380 F.2d 206, 213 (2d Cir. 1967) (Lumbard, C.J.).

### 4. A "Surveillance Location Privilege"

 We believe that policy justifications analogous to those underlying the well-established informer's privilege support a qualified privilege protecting police surveillance locations from disclosure. Like confidential informants, hidden observation posts may often prove to be useful law enforcement tools, so long as they remain secret. Just as the disclosure of an informer's identity may destroy his future usefulness in criminal investigations, the identification of a hidden observation post will likely destroy the future value of that location for police surveillance. The revelation of a surveillance location might also threaten the safety of police officers using the observation post, or lead to adversity for cooperative owners or occupants of the building. Finally, the assurance of nondisclosure of a surveillance location may be necessary to encourage property owners or occupants to allow the police to make such use of their property. For all these reasons, we are persuaded to recognize what might be termed a "surveillance location privilege." [10]

 The recognition of this privilege, however, cannot be the end of our consideration. While the public's interest in effective law enforcement and the cooperating

---

requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60–61, 77 S.Ct. at 627–628 (footnote omitted). The Court in *Roviaro* prescribed a balancing test for the treatment of the privilege in criminal trials. 353 U.S. at 62, 77 S.Ct. at 628–629.

In further comment on this subject, the Supreme Court recently observed in *United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424 (1980), that:

This Court on other occasions has noted that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself. At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial. *United States v. Matlock*, 415 U.S. 164, 172–74 [94 S.Ct. 988, 993–994, 39 L.Ed.2d 242] (1974); *Brinegar v. United States*, 338 U.S. 160, 172–74 [69 S.Ct. 1302, 1309–1310, 93 L.Ed. 1879] (1949); Fed. Rules Evid. 104(a), 1101(d)(1). Furthermore, although the Due Process Clause has been held to require the Government to disclose the identity of an informant at trial, provided the identity is shown to be relevant and helpful to the defense, *Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–628, 1 L.Ed.2d 639 (1957), it has never been held to require the disclosure of an informant's identity at a suppression hearing. *McCray v. Illinois*, 386 U.S. 300 [87 S.Ct. 1056, 18 L.Ed.2d 62] (1967). We conclude that the process due at suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself.

*See also* 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶¶ 510[06], [07] (1980).

**10.** Under Rule 501 of the Federal Rules of Evidence the federal courts retain their power to develop the common law privileges of witnesses in federal criminal trials on a case-by-case basis. *See United States v. Gillock*, 445 U.S. 360, 367, 100 S.Ct. 1185, 1190, 63 L.Ed.2d 454 (1980); *Trammel v. United States*, 445 U.S. 40, 47–48, 100 S.Ct. 906, 910–911, 63 L.Ed.2d 186 (1980). Before the adoption of the Federal Rules of Evidence, the authority to interpret and adjust the common law principles of privilege "in the light of reason and experience" was conferred by the predecessor to the current Rule 26 of the Federal Rules of Criminal Procedure, Fed.R.Crim.P. 26 (1948), and based on the Supreme Court's holdings in *Wolfle v. United States*, 291 U.S. 7, 12–13, 54 S.Ct. 279, 279–280, 78 L.Ed. 617 (1934), and *Funk v. United States*, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933). *See Mullen v. United States*, 263 F.2d 275, 278–79 (D.C.Cir.1958).

property owner's interest in anonymity support the creation of the privilege, they do not extinguish a criminal defendant's strong interest in effective cross-examination of adverse witnesses at a suppression hearing. The location of a police observation post may establish whether the observing officer's view was open or obstructed, whether the angle of the officer's view made the observations easy or difficult, and whether the distance from the criminal activity enhances or detracts from an officer's claimed observation of detail. Thus, because the location of the observation post may well be relevant to the defendant's interests, the trial court must attempt to balance the interests of the public and the police in nondisclosure and the interest of the defendant in accurate fact-finding.

How a court can best protect the defendant's interests at the suppression hearing while also recognizing the privilege will differ from case to case. We therefore refrain from declaring a specific procedure for use in all suppression hearings that involve observations from police surveillance locations. Courts have employed at least two different methods to balance these competing interests.

In *Hicks v. United States*, 431 A.2d 18 (D.C.1981), the District of Columbia Court of Appeals recognized a surveillance location privilege. That Court suggested that if the surveillance location is relevant to the determination of probable cause, the trial court may exercise its discretion to conduct an *in camera* proceeding in which the Government informs the court of the secret location. 431 A.2d at 22 & n.2.[11]

In *United States v. Jenkins*, 530 F.Supp. 8 at 9 * (D.D.C.1981), the District Court directed the Government to identify the location of the observation post to the defendant's counsel, who was subject to a protective order not to disclose the location to his client or to anyone else. After personal observation from the surveillance location, the defendant's counsel was given leave to reopen the hearing if he thought the police officers' view was obstructed or otherwise contradicted their testimony.

█ Each of these procedures has advantages and disadvantages. We therefore leave it to the trial courts to decide in the circumstances of each suppression hearing whether either of these procedures, or some other appropriately fashioned procedure, is necessary, and if so, which method should be employed in that particular case. In exercising its discretion, a trial court should endeavor to protect the public interests that give rise to the surveillance location privilege, while also taking any steps necessary to ensure accurate fact-finding and to protect the defendant's Fourth Amendment rights.

5. *Application of the "Surveillance Location Privilege" in This Case*

█ In the case before us there was no disclosure of the Police Department's surveillance location either to the District Court or to the defendant's counsel. As a result, the defendant was forced to rely only on the cross-examination of Officers Allman and Willis, as limited by the recognition of the surveillance location privilege, in his attempt to refute the finding of probable cause. In the context of this case, however, this was not error.

Green argues that Officer Allman's testimony at the suppression hearing asserted that the paper bag containing the heroin packets was in his left jacket pocket. *See* Tr. 7–9, 47–48. Officer Willis testified that Green held open the carryout door with his left hand and made a motion toward the counter with his right hand. Tr. 34–35. Neither officer ever saw the paper bag

11. The Court in *Hicks* enumerated some of the factors to be considered by a trial court in the exercise of this discretion:

When the question is probable cause, the court should consider, among other pertinent concerns, whether the defense has established that the location of the surveillance post is a material and relevant issue; whether the evidence supports a finding of probable cause; and whether the evidence creates a substantial doubt about the credibility of the observer.

*Hicks v. United States*, 431 A.2d 18, 22–23 (D.C.1981) (footnotes omitted).

transferred from Green's left to right jacket pocket or from his left to right hand. Tr. 23, 35–36, 47–48. Thus, Green contends that the officers' failure to observe either transfer casts doubt on the officers' ability to observe the occurrences which the trial court found provided probable cause for the arrest. Appellant's Brief at 12–13.

Green presented this argument attacking the reliability of the officers' claimed observations in the District Court, as well as before this court. The Record reveals that the District Court plainly recognized the difficulty presented by the inability to account for each movement of the paper bag. Tr. 52–53. Nevertheless, the District Judge commented that he was not required "to account for every movement of the hand." Tr. 53. We agree. As he noted: "[Green] might have gotten his right hand into his left pocket and gotten it up there without the officer seeing it." Id.[12] At a hearing to determine only whether probable cause existed, the failure to account for the location of the paper bag at every instant was not dispositive.

More importantly for our present inquiry, this failure to account for each movement of the paper bag before Green's arrest did not require the Government to disclose the Police Department's surveillance location.

Green succeeded in establishing the limits of the police officers' observations without learning the exact location of their observation post. Officer Allman admitted not seeing the small object exchanged between Green, Turner, and the unidentified man; Officers Allman and Willis conceded not seeing the paper bag transferred from Green's left pocket to his right hand. In these circumstances learning the exact location of the observation post would have served no useful purpose. Green had already learned on direct and cross-examination Officer Allman's distance from the transaction (75 to 80 feet), his approximate height (40 feet), the weather (sunny and clear), and that Officer Allman was using binoculars. Green has not suggested, and we cannot perceive, what additional doubt could have been cast upon the police officers' version of the events had the surveillance location been disclosed. Green has never suggested, for example, that Officer Allman's view was obstructed in any fashion.[13] In these circumstances Green was not prejudiced by the Court's failure to make even a limited disclosure of the surveillance location. Accordingly, we decline to reverse the District Court's disposition of the suppression hearing or to remand for further proceedings.[14]

**12.** During cross-examination, Officer Willis testified that Green had a cast on his right arm. Tr. 39. The District Court, apparently taking note of this testimony, inquired on further examination of Officer Allman how much of Green's hand the cast covered and whether the cast limited Green's use of his right hand. Officer Allman testified that the cast did not prevent him from handling the paper bag in his right hand. Tr. 49–50. The defendant did not contest Allman's testimony in this regard or question him further about it. We therefore reject the suggestion, Appellant's Brief at 12, that the cast prevented the passing of the bag from his left to right hand and the placement of the bag on the carryout counter.

**13.** Indeed, if defense counsel's hypothesized location of the surveillance post in the Metro Building is correct, Officer Allman seemingly should have had a clear view of the events occurring on the corner across the street from that building. See note 7 supra. Officer Allman's failure to notice a transfer of the paper bag from Green's left jacket pocket to his right hand could have occurred while Allman

watched Turner leave the area or when Allman noticed the patrol car coming into view. Tr. 10. Thus, the failure to notice this transfer, without more, does not suggest by itself that Officer Allman's view was in any way obstructed.

**14.** Because of the distinction between suppression hearings and criminal trials, see note 9 supra, and because of the more extensive procedural protections associated with the latter, our holding does not suggest that the nondisclosure of a police surveillance location would be proper at trial. Indeed, our recognition of a surveillance location privilege is built upon the established informer's privilege, Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and its progeny; this suggests that when identification of the surveillance location "is relevant and helpful to the defense of an accused ... the privilege must give way." 353 U.S. at 60–61, 77 S.Ct. at 627–628. That issue, however, is not directly before us, and we make no holding in its regard.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the arrest of Green was made with probable cause and that the District Court properly limited the defendant's cross-examination of Officer Allman regarding the location of the Police Department's "hidden observation post." As a result, we affirm the decision of the District Court.

*So ordered.*