239 N.J. Super. 620 (1990)
571 A.2d 1358
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
CLAUDE WILLIAMS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted February 26, 1990.
Decided March 23, 1990.
*621 Before Judges PETRELLA, HAVEY and STERN.
John H. Stamler, Union County Prosecutor, attorney for appellant (Steven J. Kaflowitz, Assistant Prosecutor, of counsel and on the letter brief).
Michael V. Kerwin, attorney for respondent Claude Williams.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
The issue on this appeal is whether a defendant's right to cross-examination was violated when he was precluded from questioning a police officer about the precise location of his *622 vantage point during a pre-arrest surveillance.[1] The trial judge ruled that the surveillance point would have to be disclosed in a new trial in order to satisfy defendant's Sixth Amendment right to confront and cross-examine witnesses.
The State appeals, contending that the trial judge erred in granting defendant's new trial motion.
On December 9, 1988, a Union County Grand Jury returned an indictment against defendant Claude Williams charging him with third degree possession of a controlled dangerous substance (cocaine or heroin or both), in violation of N.J.S.A. 2C:35-10(a) (count one); and third degree possession thereof with intent to distribute, in violation of N.J.S.A. 2C:35-5(b) (count two).
On June 22, 1989, the trial judge conducted a pretrial in camera hearing (from which defense counsel was excluded) to inquire as to the confidential surveillance location utilized by the police during their investigation of Williams. On the basis of that hearing, she ruled that the State would not be required to disclose the location of that surveillance point and that cross-examination during trial would be restricted to protect that information. The court later reiterated its decision when defense counsel asked for a reconsideration of the decision. At the conclusion of the proceedings on June 27, 1989, the jury found Williams guilty on both counts of the indictment.
Williams filed a motion for a new trial and moved for a judgment of acquittal based on insufficiency of the evidence. The trial judge granted the new trial motion on the ground that her earlier ruling restricting Williams' ability to cross-examine the State's witnesses as to the precise location of the surveillance site was erroneous. The motion for acquittal was denied. *623 We granted the State's motion for leave to appeal the order of the trial judge granting defendant's motion for a new trial.
The facts are not complicated. On September 17, 1988, at approximately 4:00 p.m., Officer Michael Waldron of the Plainfield Police Department Uniform Response Team (street level narcotics unit), was conducting a surveillance in the Hanna Atkins Park area of South Second Street in Plainfield. Waldron described this area as a high narcotic area due to numerous arrests and citizen complaints.[2]
From his hidden surveillance site, Waldron observed an individual, later identified as defendant Williams, making an "exchange" with another individual. Waldron observed Williams hand the individual a small item.
Waldron remained at his surveillance point and, a few minutes later, observed another individual hand Williams some money. After receiving the money Williams walked north towards the railroad tracks and reached into the weeds and high grass for a bag with a yellow strip on the top. He opened the bag, removed some small items, and put the bag back into the weeds and high grass. Williams then returned to the individual who had given him the money and handed the small items to him. Waldron testified that based on his training and experience, he believed that what he had been observing was a narcotics transaction.
Waldron then radioed Williams' description, a description of where he was standing and a description of the area of the hidden bag to three other officers who were slightly out of sight of the area. The officers contacted by Waldron drove to the area where Williams was located and detained him as well as others in the area. Waldron then directed one of those officers by radio to the exact location of the suspected bag of narcotics. The officer recovered the bag described by Waldron *624 and placed Williams under arrest. The bag was found to contain cocaine and heroin and the defendant had $268 in his possession.
An investigator from the Union County prosecutor's office testified that in her expert opinion, Williams possessed the cocaine recovered by the police with the intent to distribute it. The investigator so concluded based upon the quantity, variety and packaging of the drugs found, the money seized, the area in question and Waldron's testimony.
During the in camera hearing, Officer Waldron testified to the location of his surveillance point and the difficulty and problems with attaining its use. During both cross-examination and the in camera hearing, Waldron testified that he was approximately 150 to 220 feet away from where the drug transaction took place. Waldron stated that he used a pair of 10 X 50 binoculars to aid him in his observations and that even though it was raining pretty heavily, he was able to see clearly and there was nothing at the scene to obstruct his view. The officer also noted that his surveillance point was from a location still considered confidential by the Plainfield Police Department and that it was still in use by the department for other surveillances.
During the course of Waldron's cross-examination, the judge again ruled that Williams would not be able to question the witness as to the precise location of the surveillance point. The court reasoned that other questioning by the defense of Waldron and the other police witnesses who would testify would be sufficient to permit Williams to test the accuracy of the officer's observations. The judge also noted that Williams could cross-examine Waldron as to the distance from which he observed the transaction and as to the use of the binoculars (which defense counsel did), and that the other responding officers could be examined by Williams as to the accuracy of Waldron's radio transmissions to them. At the end of cross-examination, the judge instructed the jury that the surveillance *625 point would not be disclosed. This was reiterated during the court's charge to the jury.
At a motion for a new trial following the verdict, the judge ruled that she had erred in restricting Williams' cross-examination of Waldron, and granted a new trial, stating:
In the course of the trial I ruled against the defendant, permitted the State to maintain the confidentiality of this location. However, in retrospect, as I review the matter on the motion for a new trial, it strikes me that in the context of this particular case and the way the evidence came in, in this particular case, the only connection between this defendant and the drugs that were found and admitted into evidence and the only testimony connecting him to activity subject to the inference that it was held with intent to distribute came from the officer whose point of surveillance was kept confidential.
It was described as a substantial distance. He was observing defendant in a park, on a rainy day, amongst many trees. And by denying him access to the information as to the point of surveillance, it now seems to me that I put him in a position where he had no effective means of cross-examining that officer, and the only evidence connecting him with the illegal activity really did come from that officer from that surveillance point. And under the circumstances, I am inclined to grant the motion for a new trial, because I believe that was the incorrect ruling and it did deny Mr. Williams the opportunity for a fair trial. So I am going to vacate the jury's verdict and grant him a new trial.
This court has previously wrestled with this issue in State v. Crudup, 176 N.J. Super. 215, 422 A.2d 790 (App.Div. 1980), a case in which a Newark police officer conducted a three-day surveillance of Crudup. The police officer observed him receiving money from a number of people on the street during the surveillance, and at one time observed the defendant giving something to a person on the street. Based on the officer's observations and his opinion that Crudup was involved in making illicit narcotics transactions, a search warrant for Crudup's person, home and car was issued and executed. A search of his person revealed lottery slips, and a search of his home produced an adding machine, a calculator, numerous sheets of paper, slips, lottery ribbons, five packages of manilla envelopes and $200. This evidence, according to the police, demonstrated that defendant was working for a lottery operation as a writer. Defendant denied guilt on the charges and claimed that the evidence was planted by the police. During cross-examination, *626 the officer declined to disclose his vantage point or the approximate distance from the events observed and the prosecutor's objection was sustained. He did state that he was not in a police vehicle when he observed the money exchanged, and conceded on cross-examination that he could not see everything clearly.
The situation there was equated to the so-called "informant's privilege," of Evid.R. 36. We noted the weighty policy considerations on both sides, and stated in reversing and remanding:
We conclude that the trial judge should have conducted a hearing on the question of the necessity for withholding the location of Detective Lang's vantage point similar to the kind of hearing held when the defense demands the identity of an informer. See cases collected at N.J.Rules of Evidence (Anno. 1980), Comments to Evid.R. 36. The trial judge must accommodate the competing interests of the criminal defendant and the State. State v. Milligan, supra, 71 N.J. [373] at 384 [365 A.2d 914 (1976)]. The privilege of non-disclosure is not absolute and is subject to important limitations. Id. at 383 [365 A.2d 914].
At such hearing, the trial judge must determine the importance of disclosure in the particular case to counsel's ability to conduct an effective cross-examination on the witness' ability to perceive. The necessity for disclosure must then be weighed against the consequences of revealing the vantage point. If the vantage point is from a car, a street corner or an abandoned building, there may be no consequences; if the vantage point is in a private home or in a place of business, real potential for reprisal against the owner may weigh against disclosure. If maintenance of secrecy is necessary to protect ongoing investigations, this must be considered; if the site is no longer used or useful, other considerations could control. Indeed, an in camera evaluation of the pertinent data by the trial judge may be necessary. See In re Farber, 78 N.J. 259, 274, n. 5 to 281 [394 A.2d 330] (1978). The denial of a request for disclosure would be reversible only if the trial court `abused its discretion after weighing the competing considerations of the balancing test.' State v. Milligan, supra, 71 N.J. at 384 [365 A.2d 914]. [State v. Crudup, supra, 176 N.J. Super. at 220, 422 A.2d 790.]
Crudup and cases in other jurisdictions have indeed analogized the issue of the confidentiality of a surveillance point to the well known "informant's privilege." The seminal decision of the Supreme Court concerning the rationale for the informant's privilege where a defendant sought disclosure of the informant's identity is Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Roviaro held that an *627 informant must be revealed upon pain of dismissal if it appears he is a material witness upon a basic issue of the trial. There the Court stated:
Where the disclosure of an informer's identity, or of the contents of his communication is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.
* * * * * * * *
We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. [Roviaro v. United States, supra, 353 U.S. at 60-62, 77 S.Ct. at 628-630, 1 L.Ed.2d at 645-646.]
The Roviaro balancing test is applied in this State in ascertaining whether an informant's identity must be disclosed. Thus, in State v. Milligan, 71 N.J. 373, 365 A.2d 914 (1976) it was held that the party seeking disclosure of the informant's identity must make a substantial showing of need for the disclosure.
Therefore, while we emphasize that courts must remain sensitive to the legitimate needs of defendants and to fundamental principles of fairness, they should not honor frivolous demands for information on unsubstantiated allegations of need. This is especially true where such demands would jeopardize the protection afforded police informers. Something more than speculation should be required of a defendant before the court overrules an informer's privilege of nondisclosure. [Footnote omitted.] [Emphasis in original.] Id. at 393, 365 A.2d 914.
In general, the purpose of the privilege is to further the public interest in effective law enforcement. By preserving the anonymity of informers, the privilege encourages citizens to perform their civic duty to communicate knowledge of wrongdoing to law enforcement officials without fear of reprisals. Grodjesk v. Faghani, 104 N.J. 89, 514 A.2d 1328 (1986). See also Cashen v. Spann, 66 N.J. 541, 334 A.2d 8, cert. denied, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46 (1975); State v. Oliver, 50 N.J. 39, 231 A.2d 805 (1967).
*628 The trial judge in this case also considered United States v. Green, 670 F.2d 1148 (D.C. Cir.1981), since the facts here are similar to those in Green. In Green, a police officer was stationed at an undisclosed observation post investigating narcotics activity at the intersection of 14th and V Streets in the District of Columbia, a neighborhood notorious for the trafficking of narcotics. With the aid of a pair of binoculars, the officer observed what he believed to be a two-party drug transaction. He then radioed descriptions of the defendant and some of the other individuals involved to officers awaiting his instructions in an unmarked patrol car two blocks away. The officers drove to the intersection and followed Green into a small carryout restaurant. Inside they found a brown paper bag containing heroin lying a few feet from where Green was hiding. After the District Court denied his motion to suppress evidence, Green was convicted of possession of a controlled dangerous substance with intent to distribute. On appeal, Green challenged the outcome of the suppression hearing maintaining that the police lacked probable cause and that the District Court erred in sustaining the Government's objection during the suppression hearing to the disclosure of the police surveillance location.
During the Government's presentation of evidence at the suppression hearing, the officer testified that he was in a "hidden observation post" making observations with a pair of 10 X 50 power binoculars, and that the weather that morning was sunny and clear. On cross-examination, defense counsel attempted to ascertain the location of the observation post. Testimony was elicited that the officer was 75 to 80 feet from the observed transaction and was about 40 feet above ground level. The Government's objection to a question that might have identified the building in which Officer Allman, who conducted the surveillance, was located was sustained.
Green contended that the trial judge erred in allowing the officer to refuse to disclose his precise surveillance location at the suppression hearing. The Court of Appeals disagreed, *629 noting that "policy justifications analogous to those underlying the well-established informer's privilege support a qualified privilege protecting police surveillance locations from disclosure." Id. at 1155. It declined to either reverse the District Court's disposition of the suppression hearing or remand, stating:
Green succeeded in establishing the limits of the police officers' observations without learning the exact location of their observation post. Officer Allman admitted not seeing the small object exchanged between Green, Turner, and the unidentified man; Officers Allman and Willis conceded not seeing the paper bag transferred from Green's left pocket to his right hand. In these circumstances learning the exact location of the observation post would have served no useful purpose. Green had already learned on direct and cross-examination Officer Allman's distance from the transaction (75 to 80 feet), his approximate height (40 feet), the weather (sunny and clear), and that Officer Allman was using binoculars. Green has not suggested, and we cannot perceive, what additional doubt could have been cast upon the police officers' version of the events had the surveillance location been disclosed. Green has never suggested, for example, that Officer Allman's view was obstructed in any fashion. [Footnote omitted.] In these circumstances Green was not prejudiced by the court's failure to make even a limited disclosure of the surveillance location. [Id. at 1157.]
The court noted, however, in a footnote:
Because of the distinction between suppression hearings and criminal trials, see note 9 supra, and because of the more extensive procedural protections associated with the latter, our holding does not suggest that the nondisclosure of a police surveillance location would be proper at trial. Indeed, our recognition of a surveillance location privilege is built upon the established informer's privilege, Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and its progeny; this suggests that when identification of the surveillance location `is relevant and helpful to the defense of an accused ... the privilege must give way.' 353 U.S. at 60-61, 77 S.Ct. at 627-628. That issue, however, is not directly before us, and we make no holding in its regard. [Id. at n. 14.]
Our Supreme Court has similarly noted a distinction in ascertaining when a defendant's right to confrontation may be deemed to have more weight. See State v. Burnett, 42 N.J. 377, 201 A.2d 39 (1964) in which then Chief Justice Weintraub stated:
We must remember also that we are not dealing with the trial of the criminal charge itself. There the need for a truthful verdict outweighs society's need for the informer privilege. Here, however, the accused seeks to avoid the *630 truth. The very purpose of a motion to suppress is to escape the inculpatory thrust of evidence in hand, not because its probative force is diluted in the least by the mode of seizure, but rather as a sanction to compel enforcement officers to respect the constitutional security of all of us under the Fourth Amendment. State v. Smith, 37 N.J. 481, 486 [181 A.2d 761] (1962). If the motion to suppress is denied, defendant will still be judged upon the untarnished truth. [42 N.J. at 386, 201 A.2d 39].
See also Hicks v. United States, 431 A.2d 18 (D.C.App. 1981). Defense counsel in Hicks established that the surveillance position from which the police officer allegedly observed defendant in possession of heroin was material to the issue of probable cause to arrest defendant. Nevertheless, because defense counsel failed to elicit any irreconcilable inconsistencies in the officer's testimony or any independent reason to discredit him, the court held that the officer's testimony was sufficiently credible for the arrest and the judge below properly limited cross-examination of the officer about the precise location of the surveillance site.
Six months after Green was decided the same court expanded the ambit of its holding in Green so that the surveillance location privilege, like the informer's privilege, applied at trials. United States v. Harley, 682 F.2d 1018 (D.C. Cir.1982). In Harley, an undercover Washington D.C. police detective drove to the defendant's house in order to attempt to make a heroin purchase. The detective was successful and the transaction was observed by three other detectives watching from a nearby surveillance post. One of those officers used binoculars to make his observation and another filmed the transaction with a video camera equipped with a zoom lens. The defendant was convicted of distributing heroin and appealed on the basis that the Government's failure to disclose the police surveillance post on cross-examination violated his rights under the Sixth Amendment's confrontation clause.
The court extended Green and held that the surveillance location privilege, like the informer's privilege, would now apply at trials, and not just at suppression hearings. Moreover, the court noted that the proper approach would be through a *631 balancing test controlled by "the fundamental requirements of fairness." Id. at 1020, citing Roviaro v. United States, supra (353 U.S. at 60, 77 S.Ct. at 628, 1 L.Ed.2d at 645 (1957)). The court explained that a defendant seeking to learn the location of a police surveillance post should ordinarily show that he or she needs the evidence to conduct his or her defense and that there are no adequate alternative means of getting at the same point. The degree of the handicap established by the defendant, the court noted, must then be weighed by the trial judge against the policies underlying the privilege. The court noted that "this is necessarily a somewhat ad hoc balancing process so that, as Roviaro said, `no fixed rule with respect to disclosure is justifiable.'" United States v. Harley, supra (682 F.2d at 1020). On cross-examination, the officer who had made the surveillance observations stated that he was between 20 and 30 yards from the drug transaction and was approximately 10 to 12 feet above street level. The government's objection to the floor on which the apartment was located was sustained. The court reasoned that defense counsel showed no adequate reason for disclosure under the balancing test:
We have no difficulty in concluding that such a balancing test sustains the application of the surveillance location privilege here. Whether or not use of this particular surveillance post has been abandoned, as Harley suggests, so that the safety of the police officers using it is not involved, the safety of the cooperating apartment owner or tenant remains a relevant consideration as does the willingness of other citizens to cooperate with the police in this fashion in the future. These, as Green pointed out, are weighty considerations supporting the privilege.
Harley, on the other hand, made no attempt to demonstrate a need for the evidence or that alternative methods were unavailable. Id. at 1020.
Harley did involve narrow circumstances since a videotape made by one of the officers showed the entire transaction from the view that the officers' had from their surveillance post. According to the court, it demonstrated the distance, the angle, and the existence or nonexistence of obstructions in the line of sight. The court considered it difficult to believe that Harley could have gained anything more by learning the number of the apartment from which the police had observed him. Id. at *632 1021. See also Jenkins v. U.S., 541 A.2d 1269 (D.C.App. 1988); United States v. Smith, 780 F.2d 1102 (4th Cir.1985); Thompson v. United States, 472 A.2d 899 (D.C.App. 1984).
In Thompson, a police officer testified that through binoculars from a concealed observation post he had observed defendant repeatedly drop a small object on the ground when police came toward his general area. The observing officer directed another officer to the "abandoned" object which was found to contain 21 tinfoil packets of cocaine. The officer testified that he was stationed approximately 100 feet from the defendant and 50 feet from the ground. The court allowed defense cross-examination as to any obstructions, but not as to the exact location.
The Thompson court cited Hicks for the proposition that in the context of a pretrial suppression hearing, the government has a qualified privilege to withhold the exact location of an observation post. It noted that at the trial stage, a different interest entirely  the defendant's personal interest in avoiding wrongful conviction  must be balanced against the same governmental interest, the protection of surveillance. Because an important substantive right of defendant was at stake the court observed that the result of the balancing process may be different at the trial stage from what it would have been at the pretrial stage. Id. at 900. To overcome the privilege, a defendant "should ordinarily show that he needs the evidence to conduct his defense and that there are no adequate alternative means of getting at the same point." Ibid. The court concluded:
Here, appellant failed to carry his initial burden of showing that the evidence was needed for his defense. At the time of his initial request for disclosure, defense counsel offered no showing that there was any vantage point in the relevant area that would not permit a clear view of appellant's activities. Defense counsel, while raising a question as to whether there were trees that might have obstructed Officer Watkins' view, then acknowledged that he did not know whether there were any trees on the block. Nor did he suggest that the angle at which appellant's activities would have been viewed from some possible surveillance locations would have rendered some of them unobservable. In fact, counsel declined to continue a line of questioning that might have *633 elicited some of the relevant information from the witness. In the absence of any showing of defense need for the information, the trial court properly refused to permit cross-examination on the exact location of the observation post. Id. at 901.
The State here argues simply that the court exercised its discretion reasonably when it restricted counsel's cross-examination during trial and, therefore, the trial court erred in granting the motion for a new trial. To ascertain whether the trial judge erred, we must review the weighing process engaged in by the trial judge.
The conviction of defendant Williams for possession and intent to distribute was premised in part on the testimony of Officer Waldron. Waldron's answer to how far away he was when he observed the drug activity was somewhat imprecise. He testified that he was anywhere between 150 to 220 feet away from the alleged drug transaction. Williams argues that this requires that the surveillance site must be disclosed for proper and constitutional cross-examination.
On the other hand, there are numerous counter-balancing factors. This is not a distribution case and there was other evidence, in addition to Waldron's testimony, to establish the elements of the offenses charged. Moreover, the surveillance point is situated at a location which deserves protection. As the Crudup court noted, this may be a situation where "real potential for reprisal against the owner may weigh against disclosure." 176 N.J. Super. at 220, 422 A.2d 790. In his in camera testimony, which we have received and reviewed, Officer Waldron testified to the problems involved regarding the disclosure of the location because of the effect it might have upon the site, including potential reprisals. Because of damage due to reprisals to other sites when their use has been revealed, the Plainfield Police Department is no longer able to use them as surveillance points. Waldron noted that the surveillance point is still in use and that this area is probably the worst area *634 in Plainfield for narcotics activity.[3]
The transcripts demonstrate that cross-examination at the trial brought out the distance from which Officer Waldron observed Williams, the weather on that day, the time of day of the observation, and the fact that the officer used binoculars in making his observations. Further, the photographs submitted to the trial court at the in camera hearing and which we have also considered demonstrate there were no obstructions in Officer Waldron's line of view, and indeed he testified to that effect.
We recognize and fully respect the Sixth Amendment right of cross-examination. Undoubtedly, it is one of the most crucial protections afforded a defendant. The right to confront and cross-examine adverse witnesses is a fundamental aspect of a fair trial. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The essential purpose of confrontation is to secure the opportunity of cross-examination. State v. King, 112 N.J. Super. 138, 270 A.2d 633 (App.Div. 1970) aff'd o.b. 59 N.J. 525, 284 A.2d 350 (1971). Although this case presents a close question, the weighing of the factors on each side militate toward nondisclosure of the surveillance site. Although a defendant should be given wide latitude in confronting the witnesses against him and in cross-examining them, in this case it appears that disclosing the surveillance site would be only of peripheral assistance to Williams. It is difficult to imagine what use, if any, Williams can make of the exact surveillance site. His prior cross-examination was effective and penetrating. Disclosing the surveillance site would provide him no assistance in presenting his case and would destroy a significant tool of the Plainfield Police Department in fighting narcotics activity in Plainfield.
*635 The order of the trial judge granting a new trial is reversed. The convictions are reinstated and the matter remanded for sentencing.
NOTES
[1] We considered substantially the same issue in another appeal entitled State v. Michael A. Wyman, A-715-89, also decided this date and which involved a pretrial motion.
[2] During the course of his testimony, Officer Waldron referred to a series of photographs which he had taken of the area three to four weeks before trial.
[3] The State has made it clear that it will drop the case if the surveillance location must be disclosed.