UNITED STATES of America

v.

James Anthony FOSTER, Appellant.

No. 92–3109.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 14, 1993.

Decided March 2, 1993.

Robert L. Tucker, Asst. Federal Public Defender, argued the cause for appellant. With him on the brief was A.J. Kramer, Federal Public Defender.

James S. Sweeney, Asst. U.S. Atty., argued the cause for appellee. With him on the brief were Jay B. Stephens, U.S. Atty., John R. Fisher and Thomas C. Black, Asst. U.S. Attys.

Before: MIKVA, Chief Judge, SILBERMAN and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The principal issue is whether, under Rule 501 of the Federal Rules of Evidence, a law enforcement officer giving eyewitness testimony against an accused at trial may refuse to answer questions about the location from which the officer made his observations. We are also called upon to decide whether the district court properly sustained, on the basis of lack of relevancy, objections to questions asked by defense counsel on cross-examination.

After a jury trial, James A. Foster was convicted of unlawfully possessing more than 5 grams of crack cocaine with intent to distribute and of committing the offense within 1000 feet of a school. Sergeant Thomas Clark of the U.S. Park Police was the critical witness for the prosecution. His identification of Foster supplied the only evidence directly linking Foster with the cocaine.

The facts, as Sergeant Clark related them, are these. On a clear, sunny August afternoon, Clark settled into his observation post in a District of Columbia neighborhood known for its illicit drug activity. Thirty to forty feet below him and 150 yards away, near an apartment complex, were a parking lot, a basketball court and a playground. Clark was watching this area with 10 × 50 binoculars when he spotted an individual, whom he later identified as Foster, sitting in the front seat of a car in the parking lot.

Events typical of drug dealing then unfolded. Sergeant Clark saw Foster give something to someone in the back seat, leave the car, walk to the basketball court, receive money from another individual, count the bills, hand over a small white object, walk away, take two clear plastic bags from his pocket, put them into a brown paper bag, drop the bag over a chain link fence, pick up the bag again, walk over to the apartment building and drop the paper bag near another fence. Clark radioed a description of Foster. Other officers arrived at the scene. One arrested Foster and found $311 on him. Another officer retrieved the brown bag. It held 51 packets of crack cocaine.

Naturally, the defense sought to raise doubts about the accuracy of Clark's identification. During cross-examination, defense counsel asked Clark to reveal the spot from which he made his observations. The government objected on the basis of the "observation post privilege" and the district court sustained the objection. The court's ruling raises the first issue.

I

With exceptions unnecessary to mention, the privilege of a witness not to testify about a matter in a federal trial is "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Rule 501, Fed. R.Evid. Two decisions of this court under Rule 501, the government maintains, entitled Clark to refuse to answer. One is *United States v. Green,* 670 F.2d 1148 (D.C.Cir.1981); the other *United States v. Harley,* 682 F.2d 1018 (D.C.Cir.1982).

*Green* drew an analogy to the informer's privilege, which permits the government to withhold the identity of a person who supplied information about criminal activity.

Revealing the person's identity could "destroy his future usefulness in criminal investigations"; the same might be said about revealing the location of surveillance. 670 F.2d at 1155. Disclosing the informer's name might make others less willing to cooperate; disclosing the names of persons who allowed the police to use their apartments or houses as observation posts might have the same effect. *Id.*

■ *Green* dealt with the issue in the context of a pretrial suppression hearing and so limited its holding. 670 F.2d at 1157 n. 14. As *Green* recognized, an informer's identity must be revealed at trial if this would be "relevant and helpful to the defense of an accused," *Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957), but the government still might successfully invoke the informer's privilege at a suppression hearing. *See McCray v. Illinois*, 386 U.S. 300, 311–12, 87 S.Ct. 1056, 1062–63, 18 L.Ed.2d 62 (1967). The proceedings have different functions. Suppression hearings determine whether the police engaged in unlawful conduct, and seek to deter such conduct by excluding evidence. Trials decide whether the accused committed the offense charged. Privileges shield witnesses from cross-examination. A defendant's right of cross-examination is more limited at suppression hearings than at trials, which is why hearsay is generally admissible at the former but not the latter. *See United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424 (1980).

*Harley*, on the other hand, sustained an "observation post privilege" at trial. The court took *Roviaro* to require a "balancing" of the defendant's interest in disclosure against the government's interest in nondisclosure. 682 F.2d at 1020. Crucial to *Harley* were the following considerations relating to the defendant's need to know. The officers who conducted the surveillance were not essential witnesses for the prosecution; Harley was charged with engaging in a drug transaction with a different officer who identified him at trial. *Id.* at 1021. Defense counsel sought to learn only the floor of the apartment build-

ing from which the officers watched the transaction; no questions were raised about the officers' ability to observe. *Id.* Using a camera with a telephoto lens, the officers videotaped what they were seeing. The prosecution introduced the tape into evidence. It showed "the view the officers in the surveillance post had, the distance, the angle, and the existence or nonexistence of obstructions in the line of sight." *Id.* The *Harley* court discerned nothing more the defendant could have gained by "learning the number of the apartment from which the police observed him." *Id.* As to the government's interest in maintaining the secrecy of the observation post, the court relied on "the safety of the cooperating apartment owner or tenant" and "the willingness of other citizens to cooperate with the police in this fashion in the future." *Id.* at 1020.

■ Not one of the considerations mentioned in *Harley* in favor of the privilege is present in this case. Unlike *Harley*, the witness claiming the privilege was crucial to the prosecution. Without Sergeant Clark's testimony, the government's case against Foster would have collapsed. The more important the witness to the government's case, the more important the defendant's right, derived from the Confrontation Clause of the Sixth Amendment, to cross-examine the witness. *See Davis v. Alaska*, 415 U.S. 308, 319, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). Unlike *Harley*, the defense challenged Clark's perceptions, his ability to identify Foster and the accuracy of his identification. Fifteen other people were in the vicinity at the time, some playing basketball, others moving about in the open area. One officer who arrived on the scene in response to Clark's call describing Foster arrested someone else (who was then released). The defense understandably wanted to cross-examine Clark about his estimate of the distance between him and Foster and the angle of his view and his testimony that nothing blocked his line of sight. Without knowing the location of the observation post, the defense could not effectively probe the officer's memory or veracity about these subjects. The right of the defense to engage

in such lines of inquiry is at the heart of our system of criminal justice. The videotape in *Harley* preserved the right. *See also United States v. Van Horn*, 789 F.2d 1492, 1507–08 (11th Cir.1986). No comparable substitute was available in this case.

It is no answer to say, as the government does, that the defense failed to cast substantial doubt on the accuracy of Clark's testimony. Creating such doubt would have been one of the objectives of cross-examination following revelation of the observation post. The essence of successful cross-examination is in selecting questions that undermine the witness's version of reality. This is not so much a matter of showing a witness to be lying. An effective trial lawyer can often manage to leave the jury with the impression that the witness is too caught up in his own view, his confusions, his own particular slant on things, that it simply does not matter whether the witness believes his own testimony.

There is also a significant difference between this case and *Harley* relating to the government's interest in preserving the secrecy of the observation post. Sergeant Clark was in an open area. There is no claim that any citizen assisted him or that he needed anyone's permission to get to his post. *Harley*'s concern about protecting tenants and apartment owners who aid the police is therefore of no concern in this case. The government proposes a different theory in support of the privilege—that disclosing the observation post will destroy its usefulness in detecting criminal activity. The theory assumes that information revealed in court will become known on the street. Yet on the government's theory drug dealers already know from this case that the police can watch this particular area from a distance. After Foster's trial, only a complete fool would openly conduct a drug transaction on the parking lot or the basketball court. If one made the same assumption the government makes, there might be no crime to detect from the observation post. Keeping the spot secret would, perhaps, deter those intent on committing crime from doing so in that area. All this, of course, is speculation. We have only the government's assertion about the effect of revealing the post. A defendant's right to cross-examination cannot be circumscribed on such a basis.

 Whether *Roviaro* was a product of the Due Process Clause, as the Supreme Court said in *United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424 (1980), or merely of federal common law, as the Court wrote in *United States v. Valenzuela–Bernal*, 458 U.S. 858, 870, 102 S.Ct. 3440, 3448, 73 L.Ed.2d 1193 (1982), in a criminal trial the informer's privilege must give way when the information sought is "relevant and helpful to the defense of an accused." *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. at 628. The informant in *Roviaro*, whose identity the Court ordered divulged, was the "sole participant, other than the accused, in the transaction charged" and consequently "the only witness in a position to amplify or contradict the testimony of government witnesses." 353 U.S. at 64, 77 S.Ct. at 629. Sergeant Clark's identification testimony played an even more crucial role in Foster's prosecution. The district court therefore erred in upholding an observation post privilege in derogation of Foster's right of cross-examination.

II

The remaining issues relate to the district court's sustaining the government's objections, on the basis of relevancy, to two lines of questioning by the defense. Sergeant Clark testified on direct that he saw Foster pass something to a person seated in the back seat of a car. The first objection came when defense counsel asked Clark if he had been able to observe the features of the other person. The second objection, actually a series of objections, came in response to defense questions posed to Clark and Officer Egan, who had been called to the scene, asking whether Clark had broadcast the description not only of Foster but also of another individual Clark suspected of drug dealing in the same area at the same time.

■ We think both lines of inquiry sought to elicit relevant evidence and that the district court erred in sustaining the government's objections. The general rule is that relevant evidence is admissible. Rule 402, Fed.R.Evid. Relevant evidence, Rule 401 tells us, is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under this test, there is no such thing as "highly relevant" evidence or, as the government puts it in its brief, "marginally relevant" evidence. Evidence is either relevant or it is not.

"Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." Advisory Committee's Note to Rule 401, Fed.R.Evid. The initial step in determining relevancy is therefore to identify the "matter properly provable." As Professor James explained in a highly-regarded article, "[t]o discover the relevancy of an offered item of evidence one must first discover to what proposition it is supposed to be relevant." James, *Relevancy, Probability and the Law*, 29 CAL. L. REV. 689, 696 n. 15 (1941).

■ Whether Clark could see inside the car on the parking lot well enough to identify its occupants was a matter of consequence at trial. If he could not perceive the features of the person in the back seat this would tend to make it less likely that he was able to recognize the person in the front seat as Foster, and vice versa. Defense counsel's question to Clark about this subject therefore sought relevant evidence and the district court should have allowed it. It is of no moment that a negative answer by Clark would not have conclusively proven that he had misidentified Foster as the person possessing the bag of cocaine. Evaluating all the evidence on a particular issue is for the jury. Each piece of evidence need not be conclusive: "A brick is not a wall." 1 MCCORMICK ON EVIDENCE § 185, at 776 (J. Strong ed., 4th ed. 1992); *see* Advisory Committee's Note to Rule 401, Fed.R.Evid.

■ The questions whether Clark had broadcast the description of another individual suspected of drug dealing also sought relevant evidence. Depending on Clark's response, his answer would have had a tendency to make it more or less probable that he had confused Foster with the other person. In its case-in-chief the government put on evidence that Clark had radioed a description tallying with Foster's—a black male, about 25 years old, 6 feet tall, 150–160 pounds, with a goatee. The relevancy of Clark's and Egan's answers to the questions propounded by defense counsel illustrates Wigmore's principle of "explanation." Wigmore demonstrated that "every evidentiary fact or class of facts may call for two processes and raise two sets of questions: (1) the admissibility of the original fact from the proponent, and (2) the admissibility of explanatory facts from the opponent." 1A J. WIGMORE, EVIDENCE § 36, at 1004 (Tillers rev.1983). It is always open in a criminal case for the defendant to explain away the force of specific items of the government's proof by showing the existence of other hypotheses. "[F]or this purpose other facts affording such explanations are receivable from the [defendant]." *Id.* The district court therefore should have allowed these questions.

For the reasons given, Foster's conviction is reversed and the case is remanded for a retrial in accordance with this opinion.