971 A.2d 280

**Kyeron Michael CHURCH**

v.

**STATE of Maryland.**

**No. 53 Sept.Term, 2008.**

Court of Appeals of Maryland.

May 13, 2009.

Matthew H. Fogelson, Asst. Public Defender (Nancy S. Forster, Public Defender and Stacy W. McCormack, Asst. Public Defender, Baltimore), on brief, for appellant.

Brian S. Kleinbord, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland and Steven L. Holcomb, Asst. Atty. Gen., Baltimore), on brief, for Appellee.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

ADKINS, Judge.

In this case we address for the first time in a criminal law context whether the State has a privilege to refuse to disclose

the exact location from which police have performed covert surveillance, even when a surveilling law enforcement officer testifies against the individual regarding the information gleaned from the surveillance. This privilege has been previously recognized by the Court of Special Appeals, and we confirm the existence of that privilege. We also resolve the question of what burden, if any, rests on the State to demonstrate the need for application of the privilege in a particular case.

## FACTS AND LEGAL PROCEEDINGS

On the evening of January 12, 2006, approximately twelve individuals were gathered along Tyler Avenue in Annapolis's Robinwood community. Unbeknownst to these congregants, their actions were being monitored by undercover police officer Christopher Kintop from a concealed location. With the assistance of binoculars, Kintop noticed a man, later identified by Kintop as Kyeron Michael Church, wearing a black coat, dark colored jeans, a grey hooded sweatshirt, and a black balaclava[1] that distinguished him from the rest of the group. Kintop testified that he saw Church give a woman small white rocks in exchange for money. Kintop radioed the description of Church's clothing to other members of his unit, who arrived shortly thereafter to detain Church.

When the officers apprehended Church, they witnessed him tightly clench his rubber-gloved right hand, pull his right arm into his body, and place his fist against his chest. In the process of the arrest, Church lay on the ground and when the officers stood him up, they discovered a clear plastic bag containing cocaine on the ground. Upon searching his person, the officers discovered $600 in cash.

Church was charged with possession with intent to distribute a controlled dangerous substance and possession of a controlled dangerous substance. On the day of trial, prior to

---

1. Kintop described a balaclava as "a hood that goes over top of your head where it has a circle where only the face can be seen."

jury selection, the State made a motion *in limine,* which is the source of the error assigned by Church in this appeal. In the motion, the State asked the court to "prohibit the Defense from asking [Kintop] or having the State disclose the actual location of where th[e] surveillance was taking place." The State cited *Johnson v. State,* 148 Md.App. 364, 811 A.2d 898 (2002), *cert denied,* 374 Md. 83, 821 A.2d 370 (2003) in support of a qualified privilege not to disclose a covert surveillance location. The State represented that Kintop could testify that he had an unobstructed view and that there was no reason to disclose the actual surveillance location. When the trial court asked the State to identify the surveillance location, the State responded:

> To tell you the truth, Your Honor, I did not ask him the specific location because I don't want to know it at this point. But I can tell you that what he has told me is that he had an unobstructed view of what Mr. Church was doing and that there was nothing that was impairing his vision.

After reviewing *Johnson v. State,* the court announced its ruling:

> [THE COURT]: In terms of the motion *in limine,* the Court has had a chance to review *Johnson v. State.* It is a balancing test dealing with the safety of officers and the citizens. At this point in time I do believe that a qualified privilege not to disclose the exact location would be appropriate. But I do believe that [defense counsel] should be given wide latitude to cross-examine the officer to what he saw, sight-lines, angles, lighting, time of day it might have been, whether there were any obstructions, question his memory or any potential bias.
>
> But I do believe that it would be appropriate that angles and distances as it relates to angles and distances which may triangulate or locate the house or the building or the location where he was would be a proper subject for a motion *in limine* to be granted.
>
> So [defense] counsel you will have wide latitude in terms of the sight-lines, the angles, the lighting in terms of where he was. If it appears that it is going to triangulate or locate

the actual place where he was I will be upholding the State's motion *in limine.*

[DEFENSE COUNSEL]: Very well.

[THE COURT]: But I certainly think that if you were to ask the question was there a window between you and what you were looking at, that's appropriate. Was it a window in the Arundel Center would not be appropriate.

\* \* \*

So I will grant the State's motion in part and I think actually I'm going to have to just judge it as it comes up. I'll have to rely on counsel to be close as you ask your questions.

During the trial, Kintop offered the above-referenced testimony about the alleged drug transaction involving Church. During cross-examination, Church's counsel asked Kintop about the circumstances under which he viewed the transaction— binocular magnification, distance, lighting, and obstructions— but refrained from asking Kintop about the exact surveillance location. Church's counsel even prefaced one question by saying "I don't want to know where your location was" in keeping with the trial court's ruling.

A jury convicted Church on both counts and he was sentenced to ten years in prison without parole. Church appealed his conviction to the Court of Special Appeals, claiming that he was prejudiced because the court's ruling on the motion prohibited him from cross-examining the police about the exact police surveillance location. We granted certiorari, on our initiative, before that court decided the appeal to consider the following question: "Did the trial court err in ruling that the State did not need to divulge the exact location from which Officer Kintop had observed the alleged narcotics activity?"

## DISCUSSION

### I.

#### *Preservation*

■ The State relies on *Watkins v. State,* 328 Md. 95, 613 A.2d 379 (1992) in support of its argument that Church cannot

raise this issue because he acquiesced to the trial judge's ruling on the motion *in limine*. In *Watkins*, during the cross-examination of Ronald Brown, a State's witness, defense counsel approached the bench, and the following colloquy occurred:

DEFENSE ATTORNEY: Your Honor, I have information that Mr. Brown has a pending case that's a theft charge and he goes to trial on April 3rd.

THE COURT: Don't mention it.

DEFENSE ATTORNEY: The reason I'm saying that, I believe that I have a basis for thinking he may have been given some consideration in exchange for probation. I want to ask about the fact this happened.

PROSECUTOR: Your Honor, of course, that's exculpatory evidence and I certainly would have told [defense attorney] any deals that I had made with anybody that is testifying.

THE COURT: Alright.

DEFENSE ATTORNEY: Thank you.

(In open court.)

DEFENSE ATTORNEY: That's all I have.

328 Md. at 99, 613 A.2d at 381. Defense counsel never questioned the prosecutor's assertion that there was no deal, nor offered any evidence to the contrary. Under these circumstances, we concluded: "Defense counsel clearly accepted the prosecutor's statement that no 'deal' had been made with the witness, and acquiesced in the court's ruling. Accordingly, there is no basis for appeal from this ruling." *Id.* at 100, 613 A.2d at 381.

Church counters the State's argument with *Beverly v. State*, 349 Md. 106, 117, 707 A.2d 91, 96 (1998), which discussed and distinguished *Watkins*. In *Beverly*, we reviewed the State's argument that this Court should refuse to answer the questions raised by a defendant's claims because the defendant acquiesced to the trial judge's interpretation of the law. The alleged acquiescence in *Beverly* occurred after a lengthy discussion of whether the State and the defendant could eschew a mandatory repeat offender sentence by way of a plea agreement. The State cited the following dialogue between the

trial judge and defense counsel in support of their acquiescence argument:

> THE COURT: [B]ut tell me how I'm wrong. I mean, I'm eager to hear your point of view, but this is what I read and the only way I've read it. So, tell me what I read wrong.
>
> [BEVERLY'S COUNSEL]: Its sound [sic] right to me, Your Honor, and I have no argument as to that.

*Beverly,* 349 Md. at 117, 707 A.2d at 96. In *Beverly,* as here, the State cited *Watkins* in support of its argument that there was no basis for appeal when a party acquiesced to the court's ruling.

In our discussion of the preservation argument, we summarized the acquiescence in *Watkins:*

> In *Watkins,* we refused to address the defendant's contention that the trial judge erred in not allowing the defense to present evidence of a pending case against one of the witnesses. 328 Md. at 99–100, 613 A.2d at 381. There, defense counsel asked if he could present the evidence, the State responded, the court said "Alright," and defense counsel merely said "Thank you." We ruled that this was acquiescence and, therefore, "there [was] no basis for appeal." *Watkins,* 328 Md. at 100, 613 A.2d at 381.

*Id.* We then distinguished *Beverly* from *Watkins:*

> Unlike in the brief interchange in *Watkins,* the above discussion appears in the transcript after eleven pages of discussion of the same issue. Moreover, following that discussion, Mr. Guth, Beverly's attorney, continued, "I just think that this defendant coming into this court is ... not being given the opportunities that other individuals are given in other courts just by way of allowing him to not have the ten years without parole invoked upon them if they did wish to enter into a plea agreement. So my argument is that ... he is not being given the benefit of what other individuals are given in other courts." The court then responded:
>
> > "Okay. I don't know anything about that. I can't tell you the last time I've been in anybody else's court.... I

don't know what other people are doing. All I know is that's the way I read the law. If it's dead wrong, just show me how I'm wrong. Otherwise, *this is my decision.* I mean, as far as I can see this is what the Legislature says you've got to get. It's like use of a handgun. You know, I can give you all the sentences I want to give, but five of it has to be without parole. I can give you only five, but it's without parole because that's what I understand is a mandatory sentence."

*Id.* at 117–18, 707 A.2d at 96–97 (emphasis in original). Apparently, defense counsel did not respond to the court's last statement. We concluded:

While defense counsel is expected to argue vigorously for his client, the client also has an interest in defense counsel showing polite deference to the judge who will hear the trial. **Here, it appears that once Beverly's attorney realized that the court was not going to change its mind, defense counsel, having vigorously argued the matter, politely continued on with the matter of the day.** To deem Beverly's behavior acquiescence would be to ignore the reality of what goes on at the trial level.

*Id.* at 118, 707 A.2d at 97 (emphasis added).

We consider the present case to be closer to *Beverly* than to *Watkins.* Church made his objection to the motion *in limine* clear as soon at the State made it:

[DEFENSE COUNSEL]: **[W]e basically have our hands tied behind our back not to ask or [be] allowed to ask about the location, et cetera, would be very prejudicial to my client's right—**

[THE COURT]: Okay, what is it you would like to ask?

[DEFENSE COUNSEL]: **I'd like to know exactly, well first of all, I'd like to know where he was.** I'd like to know how far he was from my client. I'd like to know if he was using binoculars. I'd like to know—

[THE COURT]: I don't think any of that would be prohibited. I think a question of, I mean I haven't heard anything that would be prohibited so far. If you ask the

actual address that might be under the *Johnson* case. If you ask if it's a private home or a building that might be prohibited.

[DEFENSE COUNSEL]: That's fine.

(Emphasis added.)

Although the colloquy between defense counsel and the trial court lasted longer in *Beverly* than here, we categorize this case with *Beverly* rather than *Watkins* because Church stated clearly the ground for his objection to application of the privilege and the type of questions he sought to ask the officer.[2] In contrast, Watkins made a tentative statement: "I believe that I have a basis for thinking he may have been given some consideration in exchange for probation." *Watkins,* 328 Md. at 99, 613 A.2d at 381. He did not support this with any proffer of facts, nor did he reassert his claim or ask any questions after the prosecutor's assurance that there was no such deal. Watkins clearly yielded to the prosecutor's purportedly greater knowledge of the facts. Defense counsel in this case, on the other hand, after clearly stating his objection, deferred to the trial court's ruling, about which counsel had no choice.

The State also relies on *Gilliam v. State,* 331 Md. 651, 692, 629 A.2d 685, 706 (1993), *cert. denied,* 510 U.S. 1077, 114 S.Ct. 891, 127 L.Ed.2d 84 (1994) and *Grandison v. State,* 305 Md. 685, 506 A.2d 580 (1986), *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986), both of which are distinguishable from this case. *Gilliam* involved defense counsel's complete acquiescence, without objection, to the State's restrictions upon the testimony of his witness. *Gilliam,* 331 Md. at 691, 629 A.2d at 705. In *Grandison,* the defendant argued for the first time on appeal that he was entitled to have the jury consider co-conspirator sentences as mitigating factors in determining his sentence. 305 Md. at 765, 506 A.2d at 620. At

2. At the time defense counsel said "[t]hat's fine[,]" there was actually no ruling at that point. As we set forth earlier, it wasn't until after the trial judge read *Johnson* that he granted the State's motion *in limine,* in part, at which point Church responded "[v]ery well."

trial, Grandison's counsel brought up the convictions during closing argument. The State's Attorney objected, resulting in the following dialogue between the court and defense counsel:

> THE COURT: Gentlemen, I don't think you are doing anybody any good by going into this. I think we all understand what the problem is.
>
> MR. CRAWFORD: I am not certain I do, but I will drop that particular subject for the moment.

*Id.* at 764, 506 A.2d at 620. Grandison never raised this point again, nor did he receive a trial court ruling on the admissibility of co-conspirator sentences. In contrast, Church voiced clearly his objection to the motion *in limine* during the motions hearing, and the trial judge rejected his argument. Church only "dropped" the matter once the court's ruling rendered further dialogue on the matter futile.

During trial, in compliance with the court's ruling, Church's counsel prefaced his questions about the officer's vantage point with the following caveat: "And I don't want to know where your location was, but I do want to ask you how was the lighting like in the area where you were set up to observe?" This is not, as the State argues, an indication that Church acquiesced to the ruling on the motion *in limine* by not asking the precise location of the surveillance. Instead, Church's counsel was acting within the appropriate bounds of professionalism by pursuing questions in a manner consistent with the court's ruling. Like the defendant in *Beverly,* defense counsel stated his opposition to the motion *in limine* and when the matter was resolved against him, counsel deferred to the court's ruling.[3] In *Watkins,* the defense never asked for a ruling, and there was none.

█ The State's suggestion that Church had to ask questions during the trial as to the exact location of the surveillance, notwithstanding the court's pre-trial ruling, is foreclosed

---

3. It is possible that defense counsel could have, consistent with counsel's professional obligations, asked additional questions regarding the general location that invited the court to narrow its earlier ruling on the State's motion *in limine,* but the appeal point was not lost by failing to do so.

by our decision in *Prout v. State,* 311 Md. 348, 535 A.2d 445 (1988). There we explained:

> Rule 4–322(a) [(now recodified as Rule 4–323)] provides that "[a]n objection to the *admission* of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise the objection is waived." As we see it, Rule 4–322(a) is inapplicable when a trial judge rules to exclude evidence. Moreover, subsection (c) of Rule 4–322 states that to preserve an objection to a "ruling or order" *other than one admitting evidence,* "it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court." Thus, when a trial judge, in response to a motion *in limine,* makes a ruling to exclude evidence that is clearly intended to be the final word on the matter, and that will not be affected by the manner in which the evidence unfolds at trial, and the proponent of the evidence makes a contemporaneous objection, his objection ordinarily is preserved under Rule 4–322(c).[4]

*Prout,* 311 Md. at 356–57, 535 A.2d at 449 (footnote omitted, emphasis in original). *See also Simmons v. State,* 313 Md. 33, 37–38, 542 A.2d 1258, 1260 (1988)(when trial court prohibited expert testimony by granting State's motion *in limine,* defendant was not required to renew offer of testimony at trial in order to preserve the issue for review).

## II.

### The Surveillance Location Privilege

The State asserts, and Church does not challenge, that there exists a surveillance location privilege that permits non-

---

4. Prout made an unusual motion *in limine*—he filed a motion asking the court to admit, rather than exclude evidence, which was denied. "Thus the court's *denial* of Prout's motion *in limine* had the same effect as the *grant* of a traditional motion *in limine,* i.e. to exclude the proffered evidence." *Prout v. State,* 311 Md. 348, 355 n. 4, 535 A.2d 445, 448 n. 4 (1988).

disclosure of a police officer's watch post when certain policy considerations favor keeping the location a secret when weighed against a defendant's Sixth Amendment right to confront witnesses against him. Both point to the decision of the Court of Special Appeals in *Johnson v. State*, which recognizes the privilege. As we have never addressed the issue of a surveillance location privilege, we shall review the rationale of courts that have recognized the privilege. Ultimately, as explained in the next subsection, entitled "Nature of Privilege," we embrace the privilege for largely the same reasons advanced by the Court of Special Appeals in *Johnson.*

In the subsection that follows, entitled "State's Burden," we address the parties' dispute about whether there was sufficient evidence at the hearing below to justify application of the privilege. Church argues that "where the State's only basis for non-disclosure was that the officer had told the State that he had an unobstructed view, it was error for the trial court to conclude that the State did not have to divulge the covert location." The State counters that "Church has failed to proffer what else he would have asked Officer Kintop had the exact location of the covert surveillance been disclosed" and that "Church fail[ed] to proffer exactly how he was prejudiced in this case[.]"

Thus the parties' contentions boil down to the question of who has the burden to establish whether the privilege is applicable. For the reasons discussed below, we conclude that the State has a burden to show that application of the privilege will protect a legitimate State interest in each case, and that it failed to make the necessary showing in this case.

### Nature Of Privilege

Both the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee criminal defendants the right to cross-examine adverse witnesses. *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Merzbacher v. State,* 346 Md. 391, 411–12, 697 A.2d 432, 442 (1997).

In some situations, the right may reasonably be limited, but it remains a valuable right essential to an effective defense. *See Marshall v. State,* 346 Md. 186, 194–95, 695 A.2d 184, 188 (1997) ("The trial court's discretion to limit cross-examination is not boundless. It has no discretion to limit cross-examination to such an extent as to deprive the accused of a fair trial."). As discussed below, the surveillance location privilege, like its progenitor, the informer's privilege, limits the defendant's right to cross-examination and must be analyzed in light of the requirement that the defendant receive a fair trial.

The Supreme Court addressed the informer's privilege in *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957), observing that "[w]hat is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." In *Roviaro,* the Supreme Court established a balancing test to determine the appropriateness of ordering disclosure of a confidential informant in which courts must weigh "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62, 77 S.Ct. at 628–29. In Maryland, "[w]e have stressed that trial courts must apply the *Roviaro* balancing test in each case" where the informant privilege is invoked. *Warrick v. State,* 326 Md. 696, 701, 607 A.2d 24, 26 (1992).

The United States Court of Appeals for the District of Columbia Circuit has had occasion to establish similar principles for the surveillance location privilege in a trio of cases, beginning with *United States v. Green,* 216 U.S.App.D.C. 329, 670 F.2d 1148 (D.C.Cir.1981). In *Green,* the court held that a qualified privilege existed for non-disclosure of covert surveillance and specifically noted that the surveillance location privilege is built upon the established informer's privilege in *Roviaro. Id.* at 1155, 1157 n. 14. *Green* left it to trial courts to create an "appropriately fashioned procedure" in each case. *Id.* at 1156. The *Green* court advised that "[i]n exercising its discretion, a trial court should endeavor to protect the public

interests that give rise to the surveillance location privilege, while also taking any steps necessary to ensure accurate fact-finding and to protect the defendant's Fourth Amendment rights." *Id.* It explicitly limited the privilege to suppression hearings. *Id.* at 1157 n. 14.

In *United States v. Harley,* 221 U.S.App.D.C. 69, 682 F.2d 1018, 1020 (D.C.Cir.1982) the court expanded the application of the surveillance location privilege to trial proceedings. The court determined that the privilege applied where a drug deal between an undercover officer and the defendant was observed and filmed by three officers in a covert location. The *Harley* court held that "the surveillance location privilege, like the informer's privilege, applies at trials and that it, too, is to be applied through a balancing test controlled by 'the fundamental requirements of fairness.'" *Id.* at 1020 (quoting *Roviaro,* 353 U.S. at 60, 77 S.Ct. at 628). The court upheld application of the privilege when the surveillance location was in a privately owned apartment, other evidence regarding visibility and distance from the transaction was elicited on cross-examination, and a videotape of the transaction showed the jury "the view the officers in the surveillance post had, the distance, the angle, and the existence or nonexistence of obstructions in the line of sight." *Id.* at 1020–21.

*United States v. Foster,* 300 U.S.App.D.C. 78, 986 F.2d 541 (D.C.Cir.1993) illustrates how the D.C. Circuit has applied the *Green* and *Harley* factors to protect the defendant's right of cross-examination. It ruled that the covert location must be revealed when knowledge of the precise location could call into question the police officer's memory and challenge his perception. *Id.* at 543–44. The *Foster* court discussed and distinguished *Harley* in evaluating these factors:

> The *Harley* court discerned nothing more the defendant could have gained by "learning the number of the apartment from which the police observed him." As to the government's interest in maintaining the secrecy of the observation post, the court relied on "the safety of the cooperating apartment owner or tenant" and "the willingness of other

citizens to cooperate with the police in this fashion in the future."

Not one of the considerations mentioned in *Harley* in favor of the privilege is present in this case. Unlike *Harley,* the witness claiming the privilege was crucial to the prosecution. Without [the officer's] testimony, the government's case against Foster would have collapsed. The more important the witness to the government's case, the more important the defendant's right, derived from the Confrontation Clause of the Sixth Amendment, to cross-examine the witness. Unlike *Harley,* the defense challenged [the officer's] perceptions, his ability to identify Foster and the accuracy of his identification. Fifteen other people were in the vicinity at the time, some playing basketball, others moving about in the open area. One officer who arrived on the scene in response to [the officer's] call describing Foster arrested someone else (who was then released). The defense understandably wanted to cross-examine [the officer] about his estimate of the distance between him and Foster and the angle of his view and his testimony that nothing blocked his line of sight. Without knowing the location of the observation post, the defense could not effectively probe the officer's memory or veracity about these subjects. The right of the defense to engage in such lines of inquiry is at the heart of our system of criminal justice.

*Id.* (citations omitted).

Although the surveillance location privilege is a matter of first impression for this Court, the Court of Special Appeals addressed this privilege in *Johnson v. State,* 148 Md.App. 364, 811 A.2d 898 (2002), *cert. denied,* 374 Md. 83, 821 A.2d 370 (2003). The *Johnson* court recognized that a qualified privilege existed that allowed the withholding of a covert surveillance location where police were still using the location. *Id.* at 365, 366–67, 811 A.2d at 899. Johnson's associates threatened action against the location if it was found out, and the private citizen who permitted police to use the property feared reprisal if the location were revealed. *Id.* at 366–67, 811 A.2d at 899–900. The State filed a motion *in limine* to protect the

location from disclosure at trial. *Id.* at 366, 811 A.2d at 899. The trial court ruled that the covert location should not be disclosed, "indicating that the primary basis for its ruling was to protect the person or persons who consented to use of the covert location." *Id.* at 367, 811 A.2d at 900.

The Court of Special Appeals held that the trial court correctly applied a qualified privilege by balancing "the public's interest in non-disclosure against a defendant's interest in cross-examination and accurate fact finding." *Id.* at 368, 811 A.2d at 900. The court declared that the privilege must be based on a case-specific balancing of these interests, and utilized language from *Green* to articulate the balancing process that must be undertaken when considering whether the privilege applies: " 'the location of a police observation post may establish whether the observing officer's view was open or obstructed, whether the angle of the officer's view made the observations easy or difficult, and whether the distance from the criminal activity enhances or detracts from an officer's claimed observation of detail.' " *Id.* at 370–71, 811 A.2d at 902 (quoting *Green*, 670 F.2d at 1156). The court explained that the privilege provided a protection that is essential to successful law enforcement investigations, because "secret informants and secret locations are helpful only if they remain undisclosed. Revealing the hidden location (or unnamed informer) may jeopardize the safety of officers or citizens and discourage further public cooperation with the police." *Id.* at 370, 811 A.2d at 901 (citing *Green*, 670 F.2d at 1155).

In applying the privilege to the case before it, the *Johnson* court noted that "the trial court recognized a strong interest in protecting the person or persons who cooperated with police by consenting to the use of the covert location." *Id.* at 371, 811 A.2d at 902. The court took into account that Johnson had been able to elicit sufficient information on cross-examination from the officer to establish that his view had not been obstructed and that the distance was sufficient for him to view the alleged drug transaction. *Id.* at 371–72, 811 A.2d at 902–03.

The court also considered that Johnson had not demonstrated what purpose would have been served had he been permitted to question the officer about his specific location:

> The officer testified to what he saw, his sight line, the angle of his view, lighting, timing, obstructions, his memory and potential bias. Questioning from both sides elicited answers concerning the ability of the officer to see the area, significantly diminishing any prejudice to appellant from non-disclosure of the exact surveillance location. Appellant does not proffer what else he would have been able to ask the officer had the exact location of his surveillance been disclosed. We perceive no error.

*Id.* at 372–73, 811 A.2d at 903. So, in addition to finding that the State had a legitimate interest in protecting the people and property involved in the covert investigation, the court was persuaded that the defendant's interests were not being compromised by the restriction on cross-examination because knowledge of the exact location would not have rendered his cross-examination more effective.

We agree that there is a qualified privilege for the State to refuse to disclose the location of an ongoing place of surveillance. *See Green,* 670 F.2d at 1155. *See also, e.g., United States v. Cintolo,* 818 F.2d 980, 1002 (1st Cir.1987)(finding "the policy of qualified privilege to be entirely appropriate in the context of criminal trials where a defendant seeks disclosure of confidential government surveillance information"); *Hicks v. United States,* 431 A.2d 18, 19 (D.C.1981)(holding that "the government has a qualified privilege to withhold the location of a secret surveillance post"); *People v. Knight,* 323 Ill.App.3d 1117, 257 Ill.Dec. 213, 753 N.E.2d 408, 417 (2001)(holding that "a qualified privilege exists at a trial for the disclosure of a surveillance location"); *Commonwealth v. Lugo,* 406 Mass. 565, 548 N.E.2d 1263, 1265 (1990)(recognizing that "[p]olicy reasons comparable to those which favor the nondisclosure of an informer support the privilege to keep a surveillance location secret"); *State v. Garcia,* 131 N.J. 67, 618 A.2d 326, 328 (1993)(recognizing "a 'surveillance location privilege,' under which the State can

refuse to disclose the exact location from which law-enforcement officers observe criminal activity"); *Hollins v. Commonwealth,* 19 Va.App. 223, 450 S.E.2d 397, 399 (1994)(holding "that the Commonwealth has a qualified privilege not to disclose the [observation] location").

■■ The qualified privilege arises when the State has an interest in protecting persons who have a property or possessory interest in the covert location, and such State interest(s) outweighs the defendant's need for disclosure for the purposes of cross-examination. We adopt the qualified privilege because it takes into account the privacy concerns of private citizens, the tools necessary for police officers to conduct routine surveillance, and the importance of a defendant's right to cross-examine witnesses and paint an accurate factual picture of the circumstances under which he or she was observed. These policy concerns provide the criteria for trial courts in considering whether the public interest served by non-disclosure is greater than the defendant's Sixth Amendment cross-examination rights.

But, our recognition of the privilege does not resolve the dispositive issue in this case, i.e. whether this balancing test must be triggered by the State's showing that it has *some* legitimate interest in protecting the particular surveillance location. A number of other jurisdictions have articulated that the burden falls on the defendant to establish why the privilege should be overcome. *See, e.g., People v. Montgomery,* 205 Cal.App.3d 1011, 252 Cal.Rptr. 779, 785 (1988)("The correct procedure in [surveillance location] cases is for the court first to ask the defendant to make a prima facie showing for disclosure."); *Bueno v. United States,* 761 A.2d 856, 859 (D.C.2000), *cert. denied,* 537 U.S. 1031, 123 S.Ct. 581, 154 L.Ed.2d 447 (2002)("A defendant who has requested the precise location of a police surveillance post must first show that he needs the information to conduct his defense before any balancing test is applied."); *Commonwealth v. Santiago,* 429 Pa.Super. 135, 631 A.2d 1323, 1327 (1993), *cert. denied,* 538 Pa. 623, 646 A.2d 1177 (1994)("It is the defendant . . . who has the

burden of demonstrating to the trial court that the [surveillance location] is material and that disclosure is in the interest of justice."). Nevertheless, we conclude, as explained below, that the State has a limited initial burden: its privilege does not arise just because it invokes a blanket non-disclosure policy. This issue proves to be dispositive of this appeal.

### State's Burden

Church frames this burden of production issue with his argument that the lower court erred in honoring the privilege because "there was absolutely no evidence presented that this covert location was still in use or that revealing the location would place anyone in danger." Thus, Church posits that the State's burden is to make a *prima facie* showing that the privilege applies by introducing evidence that the covert location was still in use, or would be used in the foreseeable future. The State insists, on the other hand, that "Church has failed to proffer what else he would have asked Officer Kintop had the exact location of the covert surveillance been disclosed." In its view, the "burden was on Church to make a more detailed proffer as to why disclosure was necessary in this case."

We impose this initial burden on the State because such burden allocation appropriately safeguards the rudimentary right of a defendant to cross-examination of witnesses against him. "Testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence.' " *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980) (quoting *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950)). "As such, they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' " *Id.* (quoting *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting)).

Although, as indicated above, a number of states have articulated that the defendant has the burden to show that his or her interests outweigh the interests of the State, few, if any, have been faced with facts like these—when the State fails to even show that the police are continuing to use the surveillance location or that any individual needs protection because of his or her association with the location. *Cf. Montgomery,* 252 Cal.Rptr. at 782 (surveilling officer "explained that the location was still being used and that disclosure of it would tend to subject someone to serious bodily injury or death"); *Bueno,* 761 A.2d at 857 ("[o]n cross-examination, [surveilling officer] testified that his observation post was presently used and had been so for a number of times"); *Santiago,* 631 A.2d at 1325 (officer testified that he "feared that disclosure of the precise location would compromise the safety of the individuals at the address").

In the absence of a showing that the State even has a legitimate interest in preventing disclosure, we see no reason why "all rational means for ascertaining truth[,]" including cross-examination about the specific location of the surveillance, should not be available to the defendant. In other words, there is no justification for applying a balancing test if the State has no legitimate interest to protect. Under such circumstances, there is nothing to balance against the defendant's interest in ascertaining the accuracy or truth of the State's testimony.

Accordingly, we hold that the trial court erred in refusing to allow Church to cross-examine about the precise location when the State had not demonstrated a threshold interest in protecting against such disclosure. We therefore remand this case to the Circuit Court under Maryland Rule 8–604(d), which provides, in relevant part: "If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court."

### On Remand

■ This remand is limited in scope, and we do not order a new trial unless and until the trial court makes certain determinations set forth below. *See Warrick*, 326 Md. at 713, 607 A.2d at 33 (limited remand instructing the trial court to make certain findings related to the informer's privilege; if trial court concluded that defendant was prejudiced, then it should order new trial). We direct this remedy because we conclude that it is not necessary that a new trial be held if: (1) the State makes the threshold showing, to the satisfaction of the trial court, that use of the surveillance location is ongoing, or that an individual associated with the location has an interest that needs protection; and (2) the trial court balances the interest of the State against Church's interest in cross-examination and decides that Church's need for the disclosure carries less weight than the State's need for concealment. As we recognized in *Montgomery Mut. Ins. Co. v. Chesson*, 399 Md. 314, 334–35, 923 A.2d 939, 950–51 (2007):

> Our jurisprudence is replete with examples where a limited remand is proper. *See e.g., Edmonds v. State*, 372 Md. 314, 812 A.2d 1034 (2002) (ordering a limited remand to hold a new Batson hearing to address the credibility of prosecutor's race-neutral explanations for the use of peremptory strikes); ... *Patrick v. State*, 329 Md. 24, 617 A.2d 215 (1992) (ordering a limited remand to determine whether a criminal defendant was prejudiced by the State's failure to disclose polygraph test results); ... *Bailey v. State*, 303 Md. 650, 496 A.2d 665 (1985) (ordering a limited remand to permit the State to provide discovery material regarding statements made by the defendant to an out-of-state police trooper and to allow the trial court to determine the appropriate sanction for the discovery violation)[.]

If, however, the trial court resolves either of these issues in favor of Church, then he shall be entitled to a new trial.

We also note that this case differs from *Southern v. State*, 371 Md. 93, 105, 807 A.2d 13, 20 (2002), in which we held that "Rule 8–604 does not afford parties who fail to meet their

burdens on issues raised in a completed **suppression hearing** an opportunity to reopen the suppression proceeding for the taking of additional evidence after the appellate court has held the party has failed to meet its evidentiary burden." (Emphasis added.) The rule of *Southern* does not apply here, because this case does not involve a suppression hearing.

Accordingly, the appropriate proceedings on remand are as follows. First, the Circuit Court should hold a hearing at which the State bears the initial burden to demonstrate that it has some legitimate interest in protecting the surveillance location, as discussed earlier. If the State produces evidence believed by the trial court to demonstrate such interest, then the court shall take such additional evidence from either party as it deems necessary to balance the interest of Church in disclosure for purposes of cross-examination against the interest of the State in concealing the surveillance location. The question of whether Church is entitled to a new trial will abide the outcome of these two steps.

**CASE REMANDED WITHOUT AFFIRMANCE OR REVERSAL FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO ABIDE THE RESULT.**

BELL, C.J., GREENE and MURPHY, JJ., Dissent.

Dissenting Opinion by GREENE, Judge, which BELL, C.J., Joins.

In this case, the State failed to show either that the police continued to use the surveillance location at issue or that any individuals needed protection in the event that the surveillance location was disclosed. Thus, there was no showing that the State had a legitimate interest in preventing disclosure and no justification for applying a balancing test or restricting Church's right of cross-examination in this case. Therefore, although I agree with the majority that the trial court erred in refusing to allow Church to cross-examine Officer Kintop about the precise location of his observations, I disagree with the majority's conclusion that a limited remand is the proper

remedy in this case. *See Church v. State,* 408 Md. 650, 672–73, 971 A.2d 280, 293 (2009). In my view, Church is entitled to the benefit of a new trial. The appropriate mandate is to reverse the judgment of the Court of Special Appeals, with directions to remand the case to the Circuit Court for purposes of a new trial.

In response to the State's motion *in limine,* the trial judge ruled promptly on the matter on the day of trial, but prior to jury selection. The judge granted the State's motion for nondisclosure, in part, pointing out that the court's ruling was directed to those questions that defense counsel might ask during cross-examination of Officer Kintop. During the trial, defense counsel made it clear that he was tailoring his cross-examination of Officer Kintop so as not to violate the trial judge's order. *Church v. State,* 408 Md. 650, 656–57, 971 A.2d 280, 283–84 (2009). Here, the majority, instead of focusing on the chilling effects of the trial judge's ruling on Church's right to effective cross-examination, focuses on the State's burden of production and the need for the trial judge to have engaged in the proper balancing test. *Id.* at 672–73, 971 A.2d at 292–93. In essence, the majority's discussion focuses more on giving the State another chance to get it right. In reaching the conclusion that a limited remand is appropriate, the majority assumes that the State will pursue the same tactics on remand that it employed in prosecuting Church the first time. That course of action, however, is not cast in stone. The State is free to elect, on remand, either to make the same motion to prevent disclosure of Officer Kintop's observation post or to not call Officer Kintop as a witness in its case-in-chief. In following the latter course of action, Officer Kintop's surveillance location would not necessarily become an issue in the State's case. Church's fundamental right to a fair trial is paramount, in my view. Thus, the only way to ensure that Church receives a fair trial and that we effectively remedy the violation of his constitutional right to confrontation and cross-examination is to grant him a new trial.

We have said that a limited remand "is neither an 'antidote' for the errors of the State or of counsel nor a method to

correct errors committed during the trial itself." *Southern v. State*, 371 Md. 93, 104, 807 A.2d 13, 19 (2002) (see cases cited therein); *see also* Md. Rule 8–604(d) (authorizing remand); *Lipinski v. State*, 333 Md. 582, 591, 636 A.2d 994, 998 (1994) (noting that although Rule 8–604(d) " 'may be suitable to correct procedures subsidiary to the criminal trial, it can never be utilized to rectify prejudicial errors committed during the trial itself' " (quoting *Gill v. State*, 265 Md. 350, 357, 289 A.2d 575, 579 (1972))); *Jones v. State*, 379 Md. 704, 726, 843 A.2d 778, 791 (2004) (Bell, C.J., dissenting) (noting that "when the error giving rise to the issue to be addressed on limited remand is one that is integral to the proceedings in which it occurred, the appropriate mandate ... would be a remand for new trial"). In *Southern* we held that a limited remand for the purpose of taking additional evidence in a reopened suppression hearing in the same case was not proper because the State failed to meet its initial burden of proof to establish the constitutionality of the defendant's detention. 371 Md. at 112, 807 A.2d at 24. We explained that to grant the limited remand would give the State "a 'second bite at the apple' in the same case," rather than "permit [the] court to cure some judicial error that resulted in unfairness to a party." *Id.*; *see also Mitchell v. State*, 337 Md. 509, 517, 654 A.2d 1309, 1313 (1995) (pointing out that the real key to determining the propriety of the limited remand is "whether the error adversely affected the defendant's right to a fair trial").

Here, the State requested that the trial judge exclude *in limine* evidence concerning Officer Kintop's exact surveillance location. Although the State failed to show it had any legitimate interest in protecting the particular surveillance location, the trial judge granted the State's motion for non-disclosure. The effect of the court's ruling unfairly restricted defense counsel's cross-examination of Officer Kintop. That ruling denied Church the benefit of a fair trial.

Secondly, I disagree with the majority's assertion that "[t]he rule of *Southern* does not apply here, because this case does not involve a suppression hearing." *Church v. State*, 408 Md. 650, 673, 971 A.2d 280, 293 (2009). In my view, a ruling on a

motion *in limine* is quite analogous to a ruling on a motion to suppress evidence. A motion *in limine*, like a motion to suppress evidence, is a request for a ruling on the admissibility of evidence before it is actually offered. Similar to the situation in *Southern*, the State, here, failed to meet its burden of establishing any grounds for Officer Kintop to refuse to disclose the location of his surveillance post. As in *Southern*, it would be unfair, in effect, to remand the case for the limited purpose of allowing the State to reopen the motion hearing to present additional evidence. Fairness dictates that Church receive a new trial. The trial judge's ruling, which restricted Church's cross-examination of Officer Kintop, constituted an error that adversely affected the defendant's right to a fair trial. Therefore, consistent with our prior case law, and on the basis of the record before us, where the State wrongfully and with undue prejudice to the defense was allowed to withhold the officer's surveillance location, the appropriate remedy is to remand for a new trial. We cannot say beyond a reasonable doubt that the improper restriction placed on Church's right of cross-examination in no way influenced the jury's verdict. *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

Therefore, I dissent. Chief Judge BELL authorizes me to state that he joins the views expressed in this dissent.

Dissenting Opinion by MURPHY, Judge.

Although I have no disagreement with the majority's analysis of the "surveillance location privilege" issue, because nothing in the record shows that Petitioner's trial counsel did not acquiesce in the *in limine* ruling at issue, I do not agree that this issue has been preserved for our review. In *Simmons v. State*, 313 Md. 33, 542 A.2d 1258 (1988), this Court held that when a trial judge's *in limine* ruling excludes a line of questions, whether that ruling is preserved for appellate review depends upon whether the ruling was intended by the judge to be a final ruling. *Id.* at 38, 542 A.2d at 1260. An *in limine* ruling that excludes a line of questions is not appealable unless the record shows that the trial court intended the

ruling to be the "final word on the matter." *Prout v. State*, 311 Md. 348, 358, 535 A.2d 445, 449–50 (1988).

Without doubt, the appropriate bounds of professionalism require that counsel question witnesses in a manner consistent with the trial court's *in limine* ruling. In the case at bar, however, immediately after making the ruling, the Circuit Court expressly stated that, "I think actually I'm going to have to just judge it as it comes up." Under these circumstances, to preserve this issue for appellate review, defense counsel was required to do more than say, "Very well," or "That's fine," when responding to the Circuit Court, and/or say, "I don't want to know where your location was," when cross examining the officer. I would hold that this appeal point *was* "lost" because at no point during the officer's cross-examination did defense counsel request that the Circuit Court reconsider its *in limine* ruling.